[No. C054954. Third Dist. May 27, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ALONZO ELMER JACKSON, Defendant and Appellant.

**C**OUNSEL

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Daniel B. Bernstein, Deputy Attorney General, for Plaintiff and Respondent.

**O**PINION

**CANTIL-SAKAUYE, J.**—Defendant Alonzo Elmer Jackson was convicted by a jury of two counts of kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1)),[1] two counts of rape (§ 261, subd. (a)(2)), three counts of sexual battery by restraint (§ 243.4, subd. (a)), and one count of sexual penetration with a foreign object (§ 289, subd. (a)(1)). With respect to the rape counts, the jury found true allegations that defendant kidnapped the victims within the meaning of section 667.61, subdivision (e)(1) and that defendant committed the offense against multiple victims within the meaning of section 667.61, subdivision (e)(5). With respect to the sexual penetration with a foreign object count, the jury found true the allegation defendant kidnapped the victim within the meaning of section 667.61, subdivision (e)(1). The court found defendant had been previously convicted of two strike prior offenses (§§ 667, subds. (b)–(i), 1170.12) and one prior serious offense (§ 667, subd. (a)).

The trial court sentenced defendant to an aggregate prison sentence of 160 years to life, composed of a 25-year-to-life term on the first rape conviction, tripled by virtue of the three strikes law, plus a five-year serious felony enhancement, plus a consecutive identical term on the second rape conviction. The trial court imposed 30-year-to-life prison terms for the sexual battery and penetration by foreign object convictions to run concurrently. The trial court imposed but stayed under section 654 prison terms on the kidnapping to commit rape convictions.

On appeal, defendant claims (1) the trial court prejudicially erred by allowing introduction of deoxyribonucleic acid (DNA) evidence in a cold hit

---

[1] Hereafter, undesignated statutory references are to the Penal Code.

case without a *Kelly*[2] hearing; (2) the trial court prejudicially erred by allowing introduction of DNA evidence obtained with the Identifiler test kit without a *Kelly* hearing; (3) the 1993 collection of his DNA sample violated the Fourth Amendment; (4) the trial court erred in denying his *Batson-Wheeler*[3] motion; and (5) prejudicial prosecutorial misconduct. Rejecting these claims, we shall affirm the judgment.

## FACTUAL BACKGROUND

*The Sexual Assault of J.O.*

In January 2002, J.O. was 18 years old and a participant in a training program with the Job Corps, living on the Job Corps campus in Sacramento. On January 20, 2002, she and another Job Corps participant, M.M., rode a Job Corps shuttle bus to the Florin Mall. After going to the mall, M.M. bought some type of strong alcohol, which both women drank before going back to the shuttle bus stop around 8:00 p.m. The shuttle was running late.

While the women were waiting, a man drove up in a white Dodge Neon. M.M. approached the man and they spoke briefly. M.M. told J.O. the man said he was looking for his niece who was in the Job Corps program and he offered to give them a ride back to the Job Corps campus. The women accepted his offer. M.M. got into the front passenger seat and J.O. got into the backseat.

M.M. and the man flirted and conversed while J.O. looked out the window. M.M. suggested J.O. massage the man's shoulders and J.O. did so, although she felt uncomfortable. J.O. heard M.M. say something about spending the night with the man for money, but J.O. thought M.M. was joking. The man said he knew where there was a party and there was some discussion about going to it. J.O. told M.M. they should go back to the Job Corps.

After driving a couple of miles, the man pulled over on a residential street because M.M. said she needed to urinate. M.M. got out of the car and went over to a bush. The man climbed into the backseat of the car with J.O. He

---

[2] *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*).

[3] *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).

started to flirt with her and was "trying to feel [her] up." J.O. kept asking where M.M. was and said they needed to get back to the Job Corps. The man got back into the driver's seat, reached over, pulled the door closed, and drove off. When J.O. asked him what he was doing, the man replied that he was going to rape her as it had always been a fantasy of his. He said he had a gun and gestured next to him, although J.O. did not see any weapon.

The man drove to a darker area where he stopped and moved quickly into the backseat. The man forcibly pushed J.O. down, got her pants off, licked her neck, and fondled her breasts and vagina. He put a condom on and put his penis inside her vagina for about two minutes. Afterwards the man handed J.O. a shirt and said something about washing the car windows. J.O. got out of the car and started running away. The man drove away. J.O. walked to a commercial street, found a pay phone and called Job Corps, telling the Job Corps's security officer she had just been raped.

Job Corps officials brought J.O. back to campus and called law enforcement. Sacramento sheriff deputies arrived and took a statement from J.O., including a description of the rapist. J.O. drove with the officers to the area of the rape, but she could not find the location exactly. The officers took her to the hospital where she underwent a sexual assault medical exam.

The nurse practitioner at the hospital noticed bruising on J.O.'s neck and a small microscopic tear at the entry of her vaginal opening, injuries which were consistent with rape. The nurse collected blood, urine and hair samples from J.O. She took several swabs from J.O.'s body, including one from her neck where saliva might have been left by the rapist. The samples taken from J.O. were preserved and screened by a criminalist with the biology unit of the Sacramento County District Attorney's laboratory of forensic services. Subsequent analysis of J.O.'s urine tested positive for chemicals associated with the drug Ecstasy, although J.O. denied she had ever taken Ecstasy that night or any prior night.

In June 2004, the Sacramento County Sheriff's Department was notified a "cold hit" from the state's DNA database identified defendant as a suspect in J.O.'s case. At trial, reference to the cold hit was not allowed and Sheriff's Detective Christopher Joachim testified before the jury that an "investigative lead" was received. Based on that information, Joachim compiled a photo lineup and met with J.O. J.O. identified defendant's photo as the most likely to be the rapist. She told Joachim she was pretty sure it was him. He had the right look, which she described as a dopey or sad look. J.O. identified defendant in court as the man who raped her.

Joachim determined defendant's address and found a white Dodge Neon belonging to defendant parked by the apartment. Defendant was arrested the next day at his place of employment, the Good Guys store located on Florin Road. Joachim took four buccal swabs from defendant's cheek, mouth and gums for DNA analysis pursuant to an authorizing court order. When shown defendant's car, J.O. identified the Dodge Neon as identical to the car in which she was raped. A package of condoms was found in the trunk, as well as two bottles of lotion.

*The DNA*

A criminalist expert in DNA extraction and analysis testified the neck swab taken from J.O. contained a mixture of DNA from two persons. The major contributor had a DNA profile that matched defendant's DNA profile at all 16 genetic markers that were tested. The minor contributor's profile was consistent with J.O.'s profile. The expert testified the major contributor's profile would be expected to occur randomly among unrelated individuals in one in 400 quintillion of the African-American population, one in 23 sextillion of the Caucasian population and one in six sextillion of the Hispanic population. Defendant is African-American.

*The Sexual Assault of O.T.*

On February 18, 2002, O.T. and her boyfriend, J.B., walked to a bus stop at 47th Street and Stockton Boulevard in Sacramento. J.B. left when a bus pulled up. When it turned out to be the wrong bus, O.T. was left waiting by herself. A man drove up and asked O.T. if she wanted a ride home. O.T. thought he looked familiar and the man acted like he knew her too. O.T. decided to go with him and got into the front passenger seat. O.T. gave the man directions to her mother's house.

The man initially drove towards O.T.'s mother's house, but then made a couple of turns unfamiliar to O.T. He told O.T. he was taking a shortcut. A short time later, he started to touch O.T., rubbing her breast and neck. O.T. brushed him away and told him she had a boyfriend. The man then stopped the car. O.T. tried to get out, but he grabbed her, locked the doors, and got on top of her. O.T. was unable to push him off.

The man kissed O.T.'s breast, neck and back. He inserted his fingers inside her vagina and tried to put his finger in her anus, but O.T. squirmed away. The man grabbed her hand and put it on his penis. O.T. pulled her arm away. The man then put his penis inside her vagina. O.T. was not sure if he ejaculated. He was not wearing a condom. Afterwards O.T. tried to put her clothes back on. The man drove to another location, stopped, and told her to get out. O.T. got out of the car. The man sped off before she could retrieve her sweatshirt.

O.T. went to a nearby phone booth and called the police. When they arrived, she gave them a description of the rapist and his car. Police searching for the rapist found O.T.'s sweatshirt in the road at the intersection of Emerson and Fruitridge Road.

O.T. was taken to the hospital where she was given a sexual assault medical exam. O.T. told the examining nurse practitioner that the rapist had put body lotion on his hand, chest, and penis. O.T said the man had ejaculated on her thigh and she had wiped it off with a towel. The nurse detected suspected semen on O.T.'s chest, abdomen, and thigh. She collected samples from those areas. She also swabbed O.T.'s breast area for possible saliva as O.T. indicated the rapist's mouth had made contact there. The evidence collected from the sexual assault medical exam was preserved and inventoried at the Sacramento County District Attorney's laboratory of forensic services. Subsequent testing of O.T.'s blood and urine samples detected the presence of marijuana consistent with use of the drug sometime in the previous day.

In February 2005, law enforcement received an "investigative lead" focusing attention on defendant as a suspect in O.T.'s rape case. Sacramento Police Detective Jimmy Vigon contacted O.T. and met with her on March 8, 2005, to show her a photo lineup. O.T. very quickly pointed to defendant's photograph and said, "That's him." Vigon went to the Sacramento County jail two days later and arrested defendant on additional charges involving O.T. O.T. identified defendant at trial as the man who raped her.

*The DNA*

The prosecution's criminalist expert in DNA extraction and analysis testified she was able to develop a DNA profile from the samples collected from O.T.'s chest and thigh. The sperm portion of the chest sample came from a single source with a DNA profile that matched defendant's DNA profile at each of 16 genetic markers. The nonsperm portion of the chest sample was a mixture of at least three people. The expert determined the DNA profiles in the nonsperm mixture were consistent with the profiles for O.T., her boyfriend J.B., and defendant. The swab from O.T.'s thigh also contained a slight mixture; the major contributor was consistent with defendant's DNA profile and the minor contributor was consistent with O.T.'s profile. The expert gave the same random match probability for the samples matching defendant's DNA profile as he gave before in J.O.'s rape case.

It was stipulated in front of the jury at trial, that on September 20, 1989, defendant was convicted of felony assault with intent to commit rape in violation of section 220.

*The Defense*

Defendant testified he was married and lived with his wife and daughter in January and February 2002. Defendant told investigating detectives he was happily married with an active sex life. At trial, however, defendant admitted he was unfaithful to his wife during this time and that they had not had sexual intercourse for nine years. Defendant testified he picked up prostitutes along Stockton Boulevard three or four times a week after work. He kept lotion and condoms in his car for that purpose.

Defendant testified he picked up M.M. and J.O. at a bus stop near the store where he worked after M.M. approached his car and asked for a ride. As he was driving them to Job Corps, M.M. was acting "really friendly," rubbing his thigh and groin area. J.O. was rubbing his shoulder and chest. They talked to him about a sexual threesome and how much it would cost. Defendant stopped his car and let M.M. out when she said she needed to go to the restroom. J.O. suggested he pull around the block to give her some privacy and defendant did so. When he stopped again, M.M. was still "using the restroom" in the bushes. Defendant climbed into the backseat with J.O. who flirted some more with him. They began kissing. J.O. took her pants down. Defendant put on a condom and they had sex. J.O. never indicated she did not want sex; the way she was kissing indicated to defendant it was okay to do more. After they had sex, J.O. got quiet and wanted to leave without M.M. Defendant told her he did not want to leave M.M. J.O. got out of the car, slammed the door and walked away.

Defendant testified he met O.T. at a gas station near the bus stop at which O.T. was waiting. O.T. asked him for a ride to her friend's house and defendant agreed. According to defendant, O.T. was dressed "slutty" and he thought she was a prostitute. He asked her if she "dated," which is a normal way of asking if she wanted to have sex for money. O.T. told him it would cost $20 for half-and-half, but as all defendant wanted was "a hand job," they agreed on $10. Defendant pulled over and O.T. gave him a hand job. Defendant did not wear a condom and he did ejaculate. O.T. then wanted $20. Defendant gave her $10, which was all he had, and she got out of the car. After he drove off, defendant found a sweatshirt in his car and he threw it out the window.

Defendant admitted at trial he lied to the investigating detectives when he denied knowing J.O. or O.T. He lied when he told detectives things were fine between him and his wife. He "probably lied about the whole thing" with J.O.

## DISCUSSION

## I.

## DNA Issues

Defendant became a suspect in these cases when the evidentiary DNA samples, taken from J.O. and O.T. during their sexual assault medical exams, were compared to profiles in the state DNA database of known offenders resulting in "cold hits" on defendant's 1993 DNA profile. After defendant was arrested, new DNA samples were obtained from defendant, developed, analyzed and compared with the evidentiary samples from J.O. and O.T.

Defendant challenged the admission of DNA evidence at trial in a series of pretrial motions. As relevant on appeal, defendant moved to exclude the DNA evidence under prong one of the *Kelly* rule (*Kelly, supra,* 17 Cal.3d 24) for cold hit statistics. Defendant moved to exclude the DNA evidence because the evidence was "based on the 'Identifiler' DNA test which has not been demonstrated to be generally accepted as reliable and reproducible in the scientific community per the *Kelly* rule." Defendant moved to suppress the DNA evidence pursuant to section 1538.5, claiming the 1993 collection and testing of his DNA violated the Fourth Amendment of the United States Constitution.

The trial court denied defendant's motion regarding cold hit statistics. The trial court ruled the use of the Identifiler test did not require a full *Kelly* hearing, but offered an Evidence Code section 402 hearing for a prong-three *Kelly* hearing. The trial court denied defendant's motion to suppress, concluding collection of defendant's blood sample did not violate defendant's constitutional rights. Defendant challenges these rulings on appeal. We first briefly describe the process of DNA analysis used in this case and then reject defendant's claims.

## A. *DNA*

" 'DNA analysis . . . is a process by which characteristics of a suspect's genetic structure are identified, are compared with samples taken from a crime scene, and, if there is a match, are subjected to statistical analysis to determine the frequency with which they occur in the general population.' [Citation.] '[O]nce analysis and comparison result in the declaration of a "match," the DNA profile of the matched samples is compared to the DNA profiles of other available DNA samples in a relevant population database or databases in order to determine the statistical probability of finding the matched DNA profile in a person selected at random from the population or

populations to which the perpetrator of the crime might have belonged.' [Citation.]" (*People v. Wilson* (2006) 38 Cal.4th 1237, 1242 [45 Cal.Rptr.3d 73, 136 P.3d 864].)

Kristie Abbott, the prosecution's expert on DNA extraction and analysis, explained DNA identification to the jury. She explained DNA is present in all the nucleated cells in the body. DNA is often referred to as the blueprint of life because it determines who you are and how you are going to develop. Over 99 percent of all human DNA is the same; DNA testing looks at the 1 percent that differs between individuals who are not identical twins.

Humans have 23 pairs of chromosomes, which are the packages that actually contain the DNA strands. DNA testing looks at different places called short tandem repeats (STR) that are on specific identified areas of different chromosomes. STR's are sets of four nucleotide units of base pairs on the DNA strand. People have different numbers of repeats. In this case 15 STR areas were examined.

The first step of DNA testing is extraction of the DNA from an oral swab of the person's mouth or from material that has a potential blood stain or semen stain.

Once extraction of the DNA is done, the next step is quantitation. Quantitation is a method for estimating approximately how much DNA is in the extract prepared from the sample. It is necessary to be successful in the amplification process.

For amplification, a specific amount of extracted DNA is placed in a thermocycler instrument. Chemicals, including primers and nucleotides, are added. Through a process known as polymerase chain reaction (PCR), copies of the DNA are produced when the thermocycler instrument goes through a temperature program, heating up and cooling down. By the time the instrument goes through 28 cycles, millions of copies of the DNA are made.

A portion of the amplified DNA is then genetically typed through a process of capillary electrophoresis. Basically, a charge is applied to the capillary in which the amplified DNA has been placed, causing the charged DNA to flow through the capillary. The smaller fragments traveling faster go through first, while the larger fragments go through last. A camera takes photographs of the separated DNA fragments utilizing fluorescent tags that have been placed on the DNA. The final results are displayed on what is called an electropherogram that can be analyzed by an expert.

The expert examines the electropherogram, develops a DNA profile, and determines if there is a match with reference samples. The expert determines the statistical significance of any match.

Abbott testified that at every step of the process the laboratory uses quality control samples and reagent controls to ensure the process is working properly. The STR process is widely accepted in the scientific community and the kits used go through validation both by the manufacturer and by the Sacramento laboratory.

In this case, Abbott used a test kit called "Identifiler." This kit examines 15 STR locations as opposed to the 13 different STR locations examined under the combination of the prior "Cofiler" and "Profiler Plus" kits. The Sacramento laboratory began using the first version of the Identifiler kit in 2002. The analysis of the evidence in J.O.'s case was done using this first version. The manufacturer then released a second version of the kit that changed a couple of the chemicals in the kit itself to get rid of artifacts (areas of results that are not within the typing region for most of the colors of the fluorescent tags and which are different shapes than the DNA) showing up in the first kit. The second Identifiler kit was used to analyze the evidence and reference samples in O.T.'s case. The process for the STR form of DNA analysis is the same regardless of the kit used.

*B. The Trial Court Did Not Err in Denying Defendant's Motion to Exclude DNA Evidence in a Cold Hit Case**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*C. The Trial Court Did Not Err in Ruling the Use of the Identifiler Test Kit Did Not Require a Full* Kelly *Hearing*

Defendant filed a pretrial motion to exclude DNA evidence at trial on the ground that the Identifiler test kit used by the prosecution had not undergone *Kelly* scrutiny. The trial court ruled the use of the Identifiler test did not require a full *Kelly* hearing, but offered to conduct a prong-three *Kelly* hearing, to ensure that correct scientific procedures have been used in the particular case. (*Kelly, supra,* 17 Cal.3d at p. 30.) Defendant chose to handle the "prong-three aspect" through cross-examination.

Defendant claims on appeal the trial court prejudicially erred by admitting DNA evidence obtained with the Identifiler test kit without a *Kelly* hearing to determine scientific acceptance (a prong-one hearing). We disagree.

---

*See footnote, *ante*, page 313.

■ The DNA amplification in this case was performed by the PCR/STR method. This methodology has been found to be generally accepted in the scientific community. (*People v. Hill* (2001) 89 Cal.App.4th 48, 57 [107 Cal.Rptr.2d 110] (*Hill*); *People v. Allen* (1999) 72 Cal.App.4th 1093, 1100 [85 Cal.Rptr.2d 655].) In addition, capillary electrophoresis, the procedure used to analyze the amplified DNA fragments, has been found to have gained general acceptance in the scientific community. (*People v. Henderson* (2003) 107 Cal.App.4th 769, 789 [132 Cal.Rptr.2d 255].)

Defendant complains, however, that the specific test kits used by the Sacramento laboratory, i.e., the first and second versions of the Identifiler test kit, use quantitatively and qualitatively different procedures from the previous test kits and therefore, the Identifiler test kit requires analysis under *Kelly*'s first prong, that the technique or method is sufficiently established to have gained general acceptance in its field (*Kelly, supra,* 17 Cal.3d at p. 30).

Defendant points to seven distinct changes made in the Identifiler test from the previous Cofiler and Profiler Plus tests: (1) the Identifiler test expands the number of loci examined from 13 to 15; (2) the Identifiler test includes a new ingredient called a "non-nucleotide linker" in the test kit; (3) the Identifiler uses a five-dye system to label DNA fragments instead of the four-dye system used previously; (4) the five-dye system increases the spectral range by 50 nanometers; (5) the software has been altered to read a five-dye system and detect the two new loci; (6) the Identifiler uses half the reaction volume previously required; and (7) the Identifiler reduces the amount of template DNA required under the previous tests.[5]

In *Hill, supra,* 89 Cal.App.4th 48, the defendant challenged the use of the Profiler Plus test kit without a prong-one *Kelly* hearing. (*Hill, supra,* at p. 55.) The Profiler Plus test kit examined 10 loci instead of four, required 20 primers instead of eight, used fluorescent tagging instead of reverse dot blot to visually identify the targeted gene, and required new computer software. (*Id.* at pp. 57–58.) The Court of Appeal "reject[ed] the argument that each new PCR/STR test kit must, as a matter of law, be subjected to a *Kelly* prong one analysis to determine scientific reliability." (*Id.* at p. 58.) It found the trial court reasonably concluded that concerns regarding the changes in the new

---

[5] In his written motion filed below, defendant contended there were eight changes between the Identifiler test kits used in this case and the former Cofiler and Profiler Plus test kits. By failing to include the eighth purported difference in his argument on appeal, defendant has forfeited the claim that such change is significant. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, pp. 627–629.)

test kit "went to prong three of *Kelly,* i.e., whether the procedures utilized by the forensic lab were in compliance with PCR/STR methodology." (*Ibid.*) It concluded the Profiler Plus test kit "uses the PCR and STR testing methods, which are generally accepted by the scientific community. It is just more sophisticated . . . ." (*Id.* at p. 60.)

■ Likewise, the Identifiler test kit uses the PCR/STR testing methods, which have been generally accepted by the scientific community. Although defendant has identified seven changes in the Identifiler kit from the previous test kits, defendant has not shown that these differences change the *methodology* of the testing of the DNA. The changes, although more numerous than those identified by *Hill* for the Profiler Plus test kit, appear to increase the accuracy and efficiency of the same methodology of PCR/STR testing. The Identifiler test kit appears to be a more sensitive test, able to use less template DNA and reaction volume to genetically type more loci using a broader range of fluorescent color dyes. Although defendant, and apparently the trial court, seemed most concerned about the introduction of "non-nucleotide linkers" in the test kit, defendant admits to not knowing what the substance is and merely speculates the nonnucleotide linkers might interfere with the evaluation of mixed samples. Defendant has not shown the use of nonnucleotide linkers makes the Identifiler test a materially distinct scientific technique. Rather, it appears Identifiler is a new and improved version of the same scientific procedure already generally accepted by the scientific community.

■ The trial court properly found a prong-one *Kelly* hearing was not required. Defendant's concerns were properly addressed through the trial court's offer of prong-three *Kelly* hearing to challenge whether the test was correctly conducted by the laboratory.

D. *The Trial Court Did Not Err In Denying Defendant's Motion To Suppress*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**II., III.**[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 313.

## DISPOSITION

The judgment is affirmed.

Davis, Acting P. J., and Morrison, J., concurred.

On June 5, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 10, 2008, S164158.