Filed 5/29/15  P. v. Salazar CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXANDER SALAZAR,<br><br>    Defendant and Appellant. | D065589<br><br><br>(Super. Ct. No. SCN244669-3) |

APPEAL from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge.  Judgment affirmed, sentence modified, and remanded with directions.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Defendant Alexander Salazar appeals his conviction and sentence after a jury trial. Salazar was convicted of first degree murder and assault with a deadly weapon or with force likely to cause great bodily injury, and the jury found true gang enhancement allegations.

On appeal, Salazar contends that (1) the trial court improperly excluded evidence about what he said to a witness, which was relayed to police by that witness; (2) the trial court improperly permitted the prosecutor to impeach one of Salazar's codefendants by presenting evidence regarding that former codefendant's guilty plea, without a limiting instruction; (3) the cumulative effect of those errors requires reversal; (4) the court erred in imposing and staying a 10-year term for the gang enhancement associated with the murder count; and (5) the abstract of judgment fails to adequately reflect the fact that the court ordered that victim restitution be paid by all codefendants jointly and severally.

We reject Salazar's claims of error regarding the evidence that the trial court excluded and admitted, and we therefore also reject Salazar's claim of cumulative error. The People concede error with respect to the court's imposing and staying a 10-year gang enhancement term, and acknowledge that the abstract of judgment should reflect that the victim restitution is to be paid jointly and severally by all codefendants. We accept the People's concessions; consequently, we modify Salazar's sentence to delete the 10-year

2

gang enhancement and direct the trial court to amend the abstract of judgment to reflect that victim restitution is to be paid by all codefendants, jointly and severally.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual background*

1.      *Prosecution evidence*

On the evening of April 10, 2008, 17-year-old Gerardo "Danny" Medina was at a family reunion at the home he shared with his parents and sister. Freddie De La Torre, then 18, who also lived with the Medina family, was at the gathering. Medina and De La Torre had been drinking alcohol and were intoxicated. Alisa Rusakova attended the party, and De La Torre asked her to drive him and Medina to a friend's house, which she did.

On the same night, Salazar, then a 17-year-old Diablos gang member, was with a group of friends at an elementary school near the Medina residence. The group included Salazar's 16-year-old brother Irwin Valdez, also a Diablos member; Irwin's girlfriend, Paloma Flores; Adan Valdez; Adan's girlfriend Georgina Vallejo; Georgina's sister Ana Vallejo; and Adan's brother, Gabriel Canseco.[1] Flores got into a fight with Ana, and afterward, Flores, Irwin, and Salazar left the group and began walking back to Salazar's home.

---

[1]      We refer to individuals who share the same last name by their first names for ease of reference.

3

Rusakova was driving Medina and De La Torre back to Medina's house when they spotted Salazar, Irwin and Flores walking. Medina yelled at Rusakova to let him out of the car. She overheard Medina tell De La Torre that he hated "those guys." Rusakova pulled the car over and Medina got out and ran after Salazar's group. De La Torre followed Medina, yelling for him to stop. Medina was not deterred, and chased the group into an apartment complex.

Irwin yelled that he saw a gun. He believed that they were being chased by gang members. Flores did not see anyone carrying a weapon. Irwin grabbed Flores's hand tightly and told her to hurry. Irwin indicated at trial that they were scared for their lives while they were running away from Medina. After Irwin and Salazar arrived at home safely, they were angry.

De La Torre caught up to Medina and tried to convince him to go home because they were drunk. Medina and De La Torre started walking home.

Salazar called Adan, who at that point was at Canseco's house with Georgina. Salazar told Adan that he and Irwin had been chased by Westside gang members with guns. Adan drove his white Mustang over to Salazar's house. Adan, Salazar and Irwin then drove in Adan's car to look for the men who had chased them. Salazar said that they eventually saw the individuals who had chased him, and he tried to get out of the car.

Someone in the white Mustang threw Diablos gang signs. In response, Medina threw his arms in the air, palms facing upward. De La Torre told Medina to run. Salazar jumped out of the car while Adan parked. Adan stayed by the car. Medina and De La

Torre left the sidewalk and a fight ensued. Salazar yelled out something about the Diablos gang. De La Torre walked toward Irwin, who pulled an aluminum bat out of his jacket. Irwin swung the bat at De La Torre, hitting him in the elbow. De La Torre backed away. Meanwhile, Salazar and Medina were fighting. Salazar was punching Medina in the face while Medina was on his knees. De La Torre was fighting for control of Irwin's bat when he saw Medina fall head first to the ground. Salazar and the others got into Adan's car and drove away as De La Torre went over to Medina.

A witness was parked in his driveway when he saw three men walking down the street toward a 7-Eleven store. The witness heard cursing and yelling in both English and Spanish. The man told police he heard someone say, "I'm going to stab you." He also heard someone say, in an aggressive manner, "You're not Ds," and, "You're not hard, homie. I'm going to fucking kill you." The witness also heard someone who sounded scared say, "No[,] please don't." The witness then heard a car start, and saw a white Mustang drive away. After the Mustang left, he heard someone yell "Danny! Danny!" several times.

That night, Officer Lee Anne McCullough was dispatched to respond to a fight at a 7-Eleven on North Midway in Escondido. When she arrived, after 11 p.m., she found Medina lying in the street, nonresponsive. Paramedics who arrived at the scene confirmed that Medina was dead.

5

Detective Greg Gay drove to the Medina home to notify Medina's family. De La Torre was at the home and was covered in blood. De La Torre initially was untruthful about what had occurred, but he eventually provided a detailed account to police, including that Medina had told Rusakova to stop the car and that Medina had chased three individuals. De La Torre could not identify the person who had attacked Medina.

After the incident, Salazar, Adan, and Irwin drove to Canseco's house. Salazar had blood on his hands and shirt. Salazar said that he had stabbed someone and that he wasn't sure if he had killed the person. Irwin said that he had hit another person with a baseball bat. Salazar cleaned himself up and also cleaned off an eight-inch folding knife. Salazar wrapped the knife in his shirt and put it inside a plastic grocery bag. Adan and Georgina dropped Salazar and Irwin off at their home approximately 30 minutes later. On the ride over, they stopped and Georgina threw the bag with the knife into a dumpster at an apartment complex.

An autopsy of Medina's body revealed that Medina had suffered nine stab wounds, one of which was to his right chest. The wound to his right chest left him with a pierced lung, heart and pulmonary artery. That wound and two other wounds were each potentially fatal. Medina died from blood loss resulting from the multiple stab wounds.

At the time he died, Medina had a cell phone, ballpoint pen, and a wallet in his possession. A forensic technician testified that the blood pattern at the scene was consistent with Medina having moved very little after being stabbed.

6

About two weeks after the incident, Irwin was interviewed. Although he initially denied having been involved in the fight, upon being confronted with information that the police knew he had been involved, Irwin told police that he had been chased. He did not say that he had been chased by armed gang members. Irwin claimed that he had run home, cutting through an apartment complex near the 7-Eleven, and that he had remained at home for the rest of the night. He denied having been in Adan's car that night, and told police that Salazar had been beaten up.

Salazar was arrested in November 2012 at the Mexican border.

2.	*Defense evidence*

Salazar's girlfriend, Andrea Landeros, who was living with Salazar and his family, testified that sometime between 8:00 p.m. and 10:00 p.m. on April 10, 2008, Irwin and Salazar had run into the house. They appeared scared and nervous and they were shaking. Salazar said that they were being chased by someone with guns, and he made a telephone call. Adan picked up Irwin and Salazar from in front of the house. Salazar seemed angry and Irwin was mad and scared.

A private investigator testified regarding the path that Salazar, Irwin, and Flores had walked from the elementary school to their home, while being chased by Medina and De La Torre into the apartment complex. She demonstrated, through photographs introduced as exhibits at trial, the lack of illumination, as well as obstructions such as parked cars and trees, as well as the distance that they had been chased.

7

B.      *Procedural background*

The San Diego County District Attorney charged Salazar with first degree murder (Pen. Code, § 187, subd. (a); count 1)[2] and assault with a deadly weapon or with force likely to cause great bodily injury (§ 245, subd. (a)(1); count 3).  The information further alleged that Salazar personally used a knife with respect to count 1 (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)), and that both counts had been committed for the benefit of, in association with, or at the direction of a criminal street gang (§186.22, subd. (b)(1)).

A jury found Salazar guilty on both counts, and found all of the enhancement allegations true.

The trial court sentenced Salazar to 35 years to life in state prison.  This sentence consisted of a term of 25 years to life on count 1, an upper term of four years on count 2, one year for the knife enhancement, and an additional five-year term for the gang enhancement corresponding with count 2.[3]

Salazar filed a timely notice of appeal.

---

[2]     Further statutory references are to the Penal Code unless otherwise indicated

[3]     The trial court also imposed and stayed execution of an additional 10-year sentence for the gang enhancement associated with count 1.  Salazar challenges this portion of his sentence, and we address his claim in part III.E., *post*.

III.

DISCUSSION

A.    *The trial court did not abuse its discretion in excluding evidence of Canseco's statements to Detective Ramirez that Salazar had told Canseco that he had been chased by gang members with guns*

Salazar contends that the trial court abused its discretion and violated his rights to due process and a fair trial by excluding evidence that Canseco told Detective Miguel Ramirez that Salazar had told Canseco that he had been chased by gang members with guns.

1.    *Additional background*

Prior to trial, Canseco was deported, and neither the prosecution nor the defense could locate him.  Defense counsel sought to admit Canseco's statement to Detective Ramirez by having Detective Ramirez testify that Canseco had told Ramirez during his interview that on the night Medina was killed, Salazar had told Canseco that he had been chased by gang members with guns.

Defense counsel argued that with respect to the first level of hearsay, Salazar's statement to Canseco was admissible pursuant to Evidence Code section 1250 to show Salazar's state of mind, and that the statement was also admissible pursuant to Evidence Code section 1240 as an excited utterance.  Counsel also argued that he was not seeking to admit Salazar's statements for its truth, but, rather, as circumstantial evidence to support his self-defense claim.  With respect to the second level of hearsay, defense

9

counsel argued that Canseco's statement to Ramirez was admissible pursuant to a nonstatutory exception to the hearsay rule, on due process grounds, since it had indicia of reliability, given that it was made shortly after the incident. Counsel further maintained that the statement was admissible on due process grounds because it was critical to Salazar's self-defense claim.

The prosecutor argued that Salazar was attempting to have his own self-serving statement admitted in evidence without having to testify.

The trial court ruled that as to Salazar's statement to Canseco, the only person who could lay a foundation as to whether the statement was a spontaneous declaration/excited utterance was Canseco, and he was unavailable. The trial court noted that at the preliminary hearing, Detective Ramirez was asked whether Canseco had been asked about Salazar's demeanor or what his voice sounded like at the time he made the statement, and Ramirez said that Canseco had not been asked those things. The court determined that defense counsel could not satisfy the foundational requirement of demonstrating that the statement was made under the stress of the event. While acknowledging that the statement had been made within 10 to 15 minutes of Salazar and Irwin being chased, the court noted that "time alone cannot satisfy the foundation requirement for a[n Evidence Code section] 1240 statement." With respect to Salazar's contention that the statement could be used to demonstrate his state of mind, in order to explain his subsequent conduct, the court concluded that the statement was not inherently trustworthy for this purpose. The court believed that it was illogical for someone to

10

approach a person while armed with only a knife if he or she believed the other person was armed with a gun. This illogical inference, as well as Canseco's unavailability, reduced the trustworthiness of the statement in the court's eyes. The court ruled that the statement was not properly admissible as state of mind evidence pursuant to Evidence Code section 1240.

As to the second level of hearsay, i.e., Canseco's statement to Detective Ramirez, the court ruled that the statement was not sufficiently trustworthy for it to be admissible as a nonstatutory exception to the hearsay rule. The court was particularly concerned with the fact that the statement involved multiple levels of hearsay, and neither party would be able to examine Salazar or Canseco about it.

The court denied defense counsel's motion to admit Canseco's statement to Detective Ramirez concerning what Salazar said to him regarding being chased by gang members with guns.

2. *Analysis*

a. *The trial court did not abuse its discretion in refusing to admit Canseco's statement to Ramirez about what Salazar had said to him*

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (*Id*., subd. (b).)

11

With respect to the first level of hearsay, Salazar's statement to Canseco, the trial court did not abuse its discretion in determining that the statement should not be admitted under any of the theories offered by the defense.

First, Salazar contends that his statement that he had been chased by gang members with guns was admissible under the spontaneous declaration exception. Evidence of a statement is not made inadmissible by the hearsay rule if the statement "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.) In order to find the exception applicable, " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318, quoting *Showalter v. Western Pacific R. R. Co*. (1940) 16 Cal.2d 460, 468.) This exception is based on the notion that this type of statement, although not necessarily more reliable or accurate, is more likely to represent " 'the unreflecting and sincere expression of one's actual impressions and belief.' " (*Showalter v. Western Pacific R. R. Co*., *supra*, at p. 468.) "[T]he mental state of the declarant—that is, the question of whether he or she was sufficiently under stress so as to dramatically reduce the possibility of deliberation and

12

prevarication—is crucial to determining whether the exception applies." (*People v. Lucas* (2014) 60 Cal.4th 153, 269-270 (*Lucas*).)

The trial court did not abuse its discretion in determining that Salazar's statement to Canseco was not admissible pursuant to the spontaneous declaration exception to the hearsay rule. The trial court found that the foundational basis for the exception was lacking, and the record supports the trial court's conclusion in this regard. In determining whether a statement is admissible pursuant to the spontaneous declaration exception, it is appropriate for a trial court to consider the level of stress or excitement evident in a declarant's voice or through his or her demeanor. (*Lucas*, *supra*, 60 Cal.4th at p. 270.) Given that Canseco was not available to testify and that he had not been asked any questions regarding Salazar's demeanor or voice when Salazar made the statement, the trial court had no basis to assess the level of stress or excitement that Salazar may or may not have been under at the time he made the statement. Given the lack of any relevant information regarding Salazar's demeanor at the time he made the statement, the trial court could not determine whether Salazar was sufficiently under stress so as to dramatically reduce the possibility of his deliberation and prevarication in making the statement.

Second, Salazar contends that his statement to Canseco was admissible under the "state of mind" exception to the hearsay rule, codified in Evidence Code section 1250. Section 1250 of the Evidence Code provides in pertinent part: "(a) Subject to [Evidence Code] Section 1252, evidence of a statement of the declarant's then existing state of

13

mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:  [¶]  (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."[4]  "[E]vidence admitted under section 1250 is hearsay; it describes a mental or physical condition, intent, plan, or motive and is received for the truth of the matter stated."  (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389.)

" 'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion.' "  (*People v. Edwards* (1991) 54 Cal.3d 787, 819–820.)  "To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness.  Such declarations are admissible only when they are ' "made at a time when there was no motive to deceive." ' [Citation.]"  (*Edwards*, *supra*, at p. 820.)

---

4    Evidence Code section 1252 provides:  "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

14

Salazar's statement that he had been chased by gang member with guns was not a statement that explained his then-existing state of mind. Salazar was not stating his mental or physical condition, nor was he describing an intent, plan, or motive. Thus, the statement was not admissible pursuant to the "state of mind" hearsay exception set forth in Evidence Code section 1250.

Finally, Salazar contends that his statement to Canseco was admissible as nonhearsay circumstantial evidence of his state of mind—i.e., that he was in fear of Medina and De La Torre, and, ultimately, that he was acting in self-defense that night during the fight. However, even if we assume that the statement could have been relevant for this nonhearsay purpose, we remain unconvinced that the trial court abused its discretion in deciding not to admit the statement for any purpose. Salazar's statement to Canseco was not made close in time to the stabbing, and thus, it had limited relevance to Salazar's claim that he acted in self-defense at the time the stabbing occurred. " ' "The test of relevance is whether the evidence tends, 'logically, naturally, and by reasonable inference' to establish material facts' . . . ." ' " (*People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) Salazar's saying that he had been chased by gang members with guns prior to the time that he left a place of safety and ultimately stabbed Medina, does not logically, naturally, or by reasonable inference tend to establish that Salazar acted in fear for his safety at the time he stabbed Medina, as the trial court pointed out. We conclude that the trial court did not abuse its discretion in excluding evidence regarding Salazar's statement to Canseco, even as circumstantial evidence of Salazar's state of mind.

15

Further, even if the trial court could have exercised its discretion to admit Salazar's statement to Canseco for the limited nonhearsay purpose of demonstrating that Salazar believed that Medina and De La Torre were gang members and possessed guns, there remained the problem that Canseco was not available to testify, and therefore, Canseco's statements to Ramirez were being offered for the hearsay purpose of establishing that Salazar did, in fact, tell Canseco that he had been chased by gang members with guns. Acknowledging that Canseco's statement to Ramirez does not fall within any recognized statutory exception to the hearsay rule, Salazar argues that, as a matter of due process, "the evidence warranted being treated as a nonstatutory exception to the hearsay rule."

Contrary to Salazar's contention that due process required the admission of Canseco's statement to Detective Ramirez concerning what Salazar had told him, the exclusion of Canseco's statement did not deprive Salazar of his constitutional right to present a defense or his constitutional rights to due process and trial by jury. A defendant has the general right to offer a defense through the testimony of his or her witnesses. (*Washington v. Texas* (1967) 388 U.S. 14, 19.) However, " '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 821, quoting *People v. Hall* (1986) 41 Cal.3d 826, 834.) Although the United States Supreme Court in *Chambers v. Mississippi* (1973) 410 U.S. 284, 302–303 (*Chambers*) determined that the combination of state rules that resulted in the exclusion of *crucial* defense evidence constituted a denial of due process under the unusual circumstances of that case, it did not question

16

"the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures."  The excluded evidence in this case was not nearly as vital to the defense as the evidence excluded in *Chambers*.  (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 56-58.)  In fact, the defense presented other evidence regarding Salazar's belief that he had been chased by gang members with guns.  Adan testified that while he was at Canseco's house, he spoke with Salazar on the telephone, and Salazar told him that he and Irwin had been chased by Westside gang members with guns. This is precisely the statement that Salazar was attempting to introduce through Detective Ramirez's testimony regarding Canseco's statement to him.  Salazar's girlfriend also testified that when Salazar and Irwin returned home after being chased, Salazar said that they had been chased by someone with guns.  Further, despite Salazar's suggestions that Canseco's statement to Ramirez was reliable, in part because it was video and audio recorded, Canseco's statement does not bear sufficient indicia of trustworthiness. Canseco's statement was not spontaneous, but instead, was made in response to police questioning.  Canseco had an obvious incentive to attempt to exonerate or at least downplay the involvement of his brother and friend in a very serious crime.  The trial court reasonably concluded that Canseco's statement to Ramirez lacked sufficient trustworthiness to allow its admission under a nonstatutory exception to the hearsay rule, and that the evidence was not so crucial to the defense that due process required its admission.

17

In any event, even assuming that the trial court's decision not to admit testimony regarding Canseco's statement to Ramirez somehow constituted an abuse of the court's discretion, Salazar cannot demonstrate that the exclusion of this evidence was prejudicial. It is well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) In general, "the application of ordinary rules of evidence . . . does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*People v.*] *Watson* [(1956) 46 Cal.2d [818] (*Watson*)] . . . ." (*People v. Marks* (2003) 31 Cal.4th 197, 227.) Thus, "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Again, the defense presented the testimony of other witnesses to support the defense's contention that Salazar believed that he had been chased by gang members with guns. Both Adan and Salazar's girlfriend testified that Salazar said that he, Irwin and Flores had been chased by someone with guns. In addition, Flores testified that it was her belief that night that she and Irwin and Salazar were being chased by gang members, and she indicated that Irwin had yelled that he saw a gun. Given all of this evidence, Salazar was able to argue that he believed Medina and De La Torre were gang members who were armed with guns, and that he was therefore acting in perfect or imperfect self-

18

defense when he stabbed Medina. Salazar's contention that the exclusion of evidence of what Canseco told Ramirez about what Salazar had said to Canseco unfairly prejudiced him at trial is thus without merit.

Further, the evidence going to Salazar's guilt was strong. After having reached a place of safety in his home, instead of calling the police, Salazar armed himself, called his friends and left the safety of his home to attempt to find the men who had chased him. This evidence undercuts any claim of self-defense, since self-defense, whether perfect or imperfect, is not available to a defendant who was the aggressor. (See, e.g., *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Given these facts, it is not reasonably probable that Salazar would have obtained a more favorable result if the trial court had admitted evidence of Canseco's statement to Ramirez that Salazar said he had been chased by gang members.

B.      *The court did not err in admitting evidence of Irwin's guilty plea without a limiting instruction*

Salazar contends that the trial court prejudicially erred in admitting evidence of his brother Irwin's guilty plea without also providing a limiting instruction.

        1.      *Additional factual history*

Irwin was charged as a codefendant in this case, but entered a plea of guilty to voluntary manslaughter, assault with a deadly weapon, and corresponding gang enhancement allegations, in exchange for a stipulated sentence.

19

Prior to trial, the prosecutor moved in limine to be permitted to introduce evidence related to Irwin's guilty plea, specifically, the factual basis for the plea in which Irwin confirmed that Salazar had killed Medina, in the event that Irwin were to deny Salazar's involvement in the crime or assert that he failed to recall what occurred when called as a witness at trial. The prosecutor indicated that the People expected that Irwin would "deny or will fail to recall [Salazar's] whereabouts at the time of the killing," and the prosecutor planned to use a transcript to impeach Irwin with any prior inconsistent statements.

Defense counsel objected to the use of the factual basis for Irwin's guilty plea. The trial court ruled that the evidence would be admissible as a prior inconsistent statement if Irwin were to testify that he could not recall Salazar's whereabouts at the time of the offense. The court noted that defense counsel was free to cross-examine Irwin about anything that might arise with respect to his admissions in the factual basis of his plea, in the event that those admissions were introduced in evidence.

During the People's case-in-chief, Irwin initially indicated that he was not feeling well, had not been able to sleep for "the past couple [of] nights," and was therefore unable to answer any questions. However, Irwin then testified that he had been sentenced to a term of 23 years in prison, but claimed that he could not remember the offenses to which he had pled guilty. Irwin also claimed that he could not recall having been in court or signing the plea form, and continued to state that he could not understand the prosecutor's questions and/or could not answer them. Irwin asserted that he could not

20

remember anything about the factual basis for his guilty plea. After the prosecutor attempted to show Irwin a copy of the plea form, and Irwin indicated that although he "d[idn't] need glasses," he nevertheless could not "focus [his] eyes," the prosecutor read to Irwin some of the language on the plea form in which Irwin admitted to certain facts, including the statement, "I was in a fight and in that fight my brother Alex Salazar stabbed the victim to death." Irwin claimed he did not remember "any of that." After Irwin continued to claim that he did not remember anything about his plea, the prosecutor read the full factual basis for the plea:

> "On the evening of April 10th, 2008, the listed victims, Danny M. and Freddie D., were walking home when a vehicle approached them. And from the vehicle an individual believed to be the driver, flashed a gang sign representing the Diablos criminal street gang at the two victims. The car then turned around, did a U-turn, came back to the victims, stopped in the street. And at that point, three suspects got out of the vehicle, one armed with a bat. That person being this defendant, Irwin Valdez. And Irwin Valdez and Alex Salazar then attacked the two victims: Irwin Valdez attacking Freddie D. and Alex Salazar, who was armed with a knife, attacked Danny M., stabbing Danny to death. [¶] Just before this occurred, there were also comments or bantering heard between the suspects and the victims about the Diablos street gang, who has a right to claim that street gang and that type of discussion."

Defense counsel objected on hearsay grounds, and the trial court overruled the objection. Irwin then claimed that he could not "even understand anything that [the prosecutor] said" because he "just c[ouldn't] focus." The court asked the prosecutor to read the statement to Irwin again and said to Irwin, "And just listen very carefully to what

21

he says. He's going to ask you if you remember him saying that in court when you pled guilty. Okay?"

Defense counsel objected on hearsay grounds and asked for a limiting instruction to the effect that the transcript was being used to refresh Irwin's memory, and not for the truth of the matter asserted. The trial court overruled the objection and determined that no limiting instruction was necessary. The prosecutor then re-read the statement to Irwin. The prosecutor continued to ask Irwin questions about his plea. Irwin responded to many questions by stating that he did not recall, or that he was feeling sick and had not slept much the night before. At one point, Irwin said that he could not continue testifying, and the court took a 15-minute recess.

Outside the presence of the jury, the trial court made a finding that Irwin was being evasive, given that Irwin had been able to answer some questions with no problems, but claimed difficulty as to others. For example, Irwin had been able to identify his signature on the form, but then "c[ouldn]'t see other things on the form." The court postponed Irwin's testimony to the following week.

The following Monday, Irwin indicated that he was "feeling much better." That day, Irwin testified that on January 7, 2009, he had pled guilty to assault with a deadly weapon, voluntary manslaughter, and two gang enhancements, in exchange for a 23-year sentence. Irwin acknowledged that he had signed the plea form, and that the plea form includes the statement, "I was in a fight and in that fight my brother Alex Salazar stabbed the victim to death." However, when asked whether he recalled the facts that he admitted

22

on the day of his plea, Irwin said that he did not. The prosecutor asked Irwin to read the transcript, but Irwin indicated he preferred that the prosecutor read it. The prosecutor then re-read the factual basis for the plea that he had read to Irwin during questioning the prior Friday. The prosecutor also said the following, reading from the transcript:

> "The Court then states[:] All right. Okay. Mr. Logan, are you satisfied with that? [¶] Then in response, I added: I would just add that after the attack and Danny M[.] was lying in the street dying, then this suspect with the other two then got back into the vehicle and left the scene and Danny passed away there in the street. [¶] The Court says: All right. Then [Irwin's defense counsel] asks: Is that accurate, Irwin, what he just said? Your response: Yes. And then the Court asked you: So other than the part about the gang banter, everything else that the DA said, that you remember is correct? Is that True? [¶] Your reply: Yes, Your Honor. The Court asked you again: Is that a yes? You again replied: Yes, Your Honor."

Irwin testified that he did not recall this exchange, but acknowledged that he had waived his constitutional rights, had been informed of what he was pleading to, and had been informed of his sentence.

2.      *Analysis*

Salazar contends that he was denied the right to due process and a fair trial as a result of the fact that his brother's plea deal, including the factual basis supporting his brother's guilty plea, was "read into the record multiple times, verbatim, along with superfluous hyperbole from the district attorney," such that the jury was permitted to use it as "substantive evidence of Salazar's guilt in the absence of a limiting instruction. "

23

Salazar argues that a codefendant's guilty plea may not be used as substantive evidence of a defendant's guilt, citing *People v. Leonard* (1983) 34 Cal.3d 183 (*Leonard*).

" 'We review the trial court's rulings on the admission of evidence for abuse of discretion.' " (*People v. Homick* (2012) 55 Cal.4th 816, 859 (*Homick*).) " ' "A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235 and 770." ' [Citation.]" (*Homick, supra*, at p. 859.)[5] " ' "The 'fundamental requirement' of [Evidence Code] section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony." [Citation.] " 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement . . . .' " [Citation.]' [Citation.] Thus, for example, ' "[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]" ' [Citation.] Similarly, under the circumstances of a particular case, a witness's refusal to answer may be materially inconsistent with prior

---

5       Evidence Code section 1235 provides:  "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."  Evidence Code section 770 provides:  "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

statements, exposing the witness to impeachment under Evidence Code section 1235."
(*Homick*, *supra*, at p. 859, internal fn. omitted.)

Here, unlike in *Leonard*, the trial court did not admit the bare fact of a codefendant's guilty plea as substantive evidence of Salazar's guilt. Rather, as in *Homick*, the court permitted the prosecutor to introduce evidence related to the substantive factual basis for Irwin's guilty plea at his change of plea hearing in order to allow the prosecutor to question Irwin regarding those prior statements, in light of Irwin's purported failure to recall specific, pertinent information regarding admissions he made related to his plea. The trial court determined that Irwin was being purposefully evasive with his repeated claims of lack of memory regarding his guilty plea and the facts supporting his plea. There is clearly a reasonable basis in the record for the trial court's finding with respect to Irwin's testimony. For example, Irwin seemed to remember certain things about the change of plea hearing, but as soon as he was asked about anything involving his brother, or his admissions regarding his and his brother's conduct during the incident, Irwin claimed that he could not "focus," was unable to understand, or could not remember. Given the trial court's specific finding that Irwin was being evasive, the trial court acted properly in allowing the prosecutor to present evidence regarding Irwin's prior inconsistent statements, even if those statements were made as part of a guilty plea. (*Homick*, *supra*, 55 Cal.4th at p. 859.)

Once this evidence was admissible as a prior inconsistent statement, there was no need for a limiting instruction, despite Salazar's contention. Evidence Code 1235 clearly permits the use of prior inconsistent statements at trial *as substantive evidence of guilt*, and does not limit the use of such statements to impeachment. (See Cal. Law Revision Com. com., 29B West's Ann. Evid. Code, § 1235 (1995 ed.) p. 225 ["Section 1235 permits a witness' inconsistent statements to be considered as evidence of the matters stated and not merely as evidence casting discredit on the witness."].) The jury was permitted to consider the admissions that Irwin made at his change of plea hearing as substantive evidence of Salazar's guilt. Salazar had the opportunity to fully cross-examine Irwin about this evidence, as well as to elicit direct testimony from him regarding his current recollections as to what occurred on the night of the incident. We therefore reject Salazar's contention that the court made any error with respect to the admission of the colloquy at Irwin's change of plea hearing and/or the statement included on Irwin's plea form.

C.       *There is no cumulative error requiring reversal*

Salazar contends that the cumulative effect of the errors that he alleges requires reversal. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) We have concluded that neither of Salazar's asserted claims of error has merit. As a result, there are no errors for which the cumulative effect would require reversal of the judgment against him.

D.      *The trial court erred in imposing and staying a 10-year term on the gang enhancement related to count 1*

Salazar contends that the trial court imposed an unauthorized sentence when it imposed and stayed a 10-year term for the gang enhancement associated with count 1.

Section 186.22, subdivision (b) establishes alternative methods for punishing felons whose crimes were committed for the benefit of a criminal street gang. Section 186.22, subdivision (b)(1)(C) imposes a 10-year enhancement when a defendant commits a violent felony for the benefit of a gang. Section 186.22, subdivision (b)(1)(C) does not apply, however, where the violent felony is "punishable by imprisonment in the state prison for life." (§ 186.22, subd. (b)(5).) Instead, in such cases, section 186.22, subdivision (b)(5) applies and imposes a minimum term of 15 years before the defendant may be considered for parole.

In *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), the Supreme Court determined that a defendant who commits a violent felony that is punishable by a term of life in prison for the benefit of a criminal street gang is not subject to the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C). Rather, such a defendant is subject to the minimum parole eligibility term of 15 years under section 186.22(b)(5). (*Lopez*, *supra*, at pp. 1007, 1011.) Because the trial court in *Lopez* had imposed the 10-year enhancement under section 186.22, subdivision (b)(1)(C), the Supreme Court modified the judgment of the trial court "to delete the 10-year gang enhancement imposed under Penal Code section 186.22[, subd.] (b)(1)(C)." (*Lopez*, *supra*, at p. 1011.)

27

In this case, the trial court sentenced Salazar to a term of 25 years to life for his conviction on count 1 for murder. The trial court imposed a 10-year term for the gang enhancement, but stayed execution of the enhancement sentence, apparently aware that it would be improper to impose and execute such a sentence. As the People concede, however, under *Lopez*, the trial court may not impose a 10-year gang enhancement term—even if execution of such a term is ordered stayed—with respect to a defendant who has been sentenced to a life term. We therefore modify Salazar's sentence to delete the 10-year gang enhancement term associated with count 1.

E.      *The abstract of judgment should be amended to clarify that restitution is to be paid by the codefendants jointly and severally.*

Salazar contends that the abstract of judgment does not accurately reflect the court's oral pronouncement of judgment with respect to the victim restitution ordered in the amount of $11,478.09. Specifically, Salazar notes that the trial court stated that the victim restitution is to be paid by the codefendants in this case jointly and severally, but the abstract of judgment does not reflect this.

The People appropriately concede the error in the abstract of judgment. The abstract of judgment should include the notation that victim restitution liability is joint and several. (See, e.g., *People v. Neely* (2009) 176 Cal.App.4th 787, 800.)

## IV.

## DISPOSITION

The judgment of conviction is affirmed, but the sentence is modified to delete the 10-year gang enhancement imposed under Penal Code section 186.22(b)(1)(C). We also remand to the trial court with the direction that the trial court modify the abstract of judgment to reflect that the victim restitution is imposed jointly and severally. The court shall prepare an amended abstract of judgment, and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____

AARON, J.

WE CONCUR:

_____

HALLER, Acting P. J.

_____

McDONALD, J.