Filed 9/26/24  P. v. Stackhouse CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B328852 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA158039) |
| v. | |
| LAWRENCE STACKHOUSE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed.

Barhoma Law, Matthew Barhoma, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Amanda V. Lopez, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Lawrence Stackhouse of first degree murder (Pen. Code, § 187(a); count 1)[1] and possession of a firearm by a felon (§ 29800(a)(1); count 2). The jury found true the allegation defendant personally used a firearm during the commission of the murder (§ 12022.5, subd. (a)).

On appeal, defendant contends the trial court erred by failing to instruct the jury on voluntary manslaughter based on imperfect self-defense. He also contends the court erred in excluding from trial his threat to sue a Los Angeles County Sheriff's Deputy for "putting a case on him." We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Prosecution Evidence**

Defendant shot and killed Andrew Bender on December 6, 2021. Bender's mechanic, Michael Harrell, witnessed the shooting.

Harrell worked with Marlon Johnson Senior ("Big Zip") and lived in a trailer located behind Big Zip's house in Compton. Several of Big Zip's family members resided in the house with him, including his son, Marlon Johnson Junior ("Little Zip"), Little Zip's half-brother, Marlow Johnson, and Big Zip's niece, Sharikah Mister.[2] The house was located in an area claimed by the Kelly Park Crips gang.

---

[1]    Subsequent unspecified references to statutes are to the Penal Code.

[2]    For clarity, we refer to the Johnsons by their monikers or first names.

Bender, the victim, was Little Zip's cousin. Bender was affiliated with the Neighborhood Crips gang. He was around 50 years old at the time of the shooting.

### 1. *Harrell's Testimony*

At trial, Harrell provided the testimony that follows concerning defendant's confrontation with Bender and the shooting.

### a. *Confrontation the Prior Day*

On December 5, 2021, Bender drove to Harrell's residence to have work done on his SUV. Harrell and Bender were acquaintances. Around noon, Bender drove Harrell to get parts for the SUV. Before leaving Harrell's residence, a young man known to be a Kelly Park Crips gang member walked up to Bender in the driveway and said, "I heard you killed my father." Bender responded, "I didn't kill your father, but I was in the car with the [men] that did." Bender then stated, "But that's past me now. I'm moving forward. I don't want to talk about that no more."

While driving to the store in Bender's SUV, Harrell watched as Bender retrieved a small, semiautomatic gun out of the center console. Harrell asked Bender what was wrong. Bender replied, "[T]here is nothing going on," and he put the gun to the side of the seat.

Harrell and Bender drove back to Harrell's residence where they saw defendant and defendant's Dodge Charger parked in the driveway. Harrell had never met defendant, but heard he was an Old-Time Gangster in the Kelly Park Crips gang. Several Kelly Park Crips gang members were talking outside the home.

Harrell saw defendant speaking with Mister in the driveway while he and Bender walked to the backyard. Bender left the backyard, returned to his SUV in the driveway, and retrieved his gun. He walked past defendant and Mister, "kind of staring at [defendant], mad[-]dogging him." Bender's gun was at his side, pointed down. Harrell went inside the house to tell Big Zip there was a problem outside. When Harrell went back outside, Mister told him Bender was "trippin. He's trippen [*sic*]." Harrell told defendant he "better watch [his] back."

Defendant pulled a gun from his waistband, laid it on the hood of his vehicle, and said, "[T]hat [man] don't like me." Defendant's gun appeared to be a .40 or .45 semiautomatic pistol. Angry with the situation, defendant got in his car and drove away. Bender stayed in the backyard waiting for Harrell to resume working on his SUV.

b.    *Shooting of Bender*

Around 8:00 a.m. the following day, Bender woke Harrell up so that he could continue working on Bender's SUV. Bender sat on a pile of bricks as Harrell worked under the vehicle, his feet hanging out from the front end. Due to police activity in the area around 8:15 a.m., Bender decided to "put his gun up" by placing it in a plastic tub under clothes behind a truck in the driveway.

Around 8:30 a.m., Harrell heard the sound of defendant's Dodge Charger and looked west toward the street. He saw defendant's vehicle drive past the house and make a U-turn. Harrell sat up from under Bender's SUV as defendant parked in front of the driveway. Defendant got out of his car, and Harrell saw "that he had a gun." Harrell watched as Bender began

4

running away from where he was sitting. As Bender "stepped on the driveway" to run away, defendant shot him once in the back.

Harrell testified that once he had been shot, Bender "turned around, put his hands up, and [defendant] walked him down and shot him" three more times in the stomach and chest from a distance of three-to-four feet. Bender did not have anything in his hands at the time and looked at defendant "in shock." Defendant shot Bender as Bender was backing away.

Harrell asked defendant, "[W]hat the fuck are you doing, man[?]" Defendant responded, "You all right," which Harrell understood as a direction to say nothing about what he witnessed. Defendant left in his car.

After defendant left, Bender told Marlow, who had just walked out of the house, "[G]et my gun and shoot that [man]." Marlow retrieved Bender's gun and walked into the middle of the street but was stopped by Harrell. Harrell called 911 and told an operator he saw the shooter. He later told the operator he "didn't get a chance to see" the shooter out of concern Marlow would perceive him as a "snitch."

Los Angeles County Sheriff's Deputy Kaluhiwa arrived at the scene and saw paramedics transporting Bender to a hospital. Bender died during emergency surgery. A medical examiner who performed Bender's autopsy testified that three of the four gunshot wounds Bender sustained were fatal.

2.    *Police Investigation*

About three months after the shooting, Harrell provided a statement to Los Angeles County Sheriff's Department Sergeant Chow. Harrell identified defendant as the shooter from a six-pack photographic lineup.

5

In August 2022, defendant was arrested at his mother's house. A search of a car defendant was seen driving the day of his arrest revealed a .9-millimeter Luger.

Law enforcement searched defendant's home the same month. Officers found a bulletproof vest and ski mask. Inside the ski mask was a .9-millimeter semiautomatic firearm. Officers also located two .9-millimeter magazines inside a black backpack and closet. A search of defendant's Dodge Charger, which was parked inside his garage, revealed a deed transferring his house to his wife. Officers impounded the Dodge Charger.

Based on GPS information extracted from defendant's vehicle, the vehicle was in the South Los Angeles County area, where Compton is located, on the day and at the time of the murder (between 7:59 a.m. and 8:26 a.m.). Cell phone data from the phone retrieved from defendant during his arrest indicated the phone used two cell towers near the scene of the shooting on December 5 and 6, 2021.

### 3. *Gang Affiliation*

Detective Arthur Garcia opined that "defendant is an active gang member from the Kelly Park [ ] Crips" based on defendant's text messages, transcripts of an interview with Mister, and a transcript of a call defendant made while in jail. Detective Garcia further opined that whenever a gang member is disrespected and does not "do anything, it's going to affect the way that they stand in the gang." The gang member "would be viewed as someone who's weak, who's not down for the hood."

4.    *Jailhouse Calls*

On August 31, 2022, after the preliminary hearing at which Harrell testified, defendant called his wife.  During the call, defendant made multiple comments about Harrell telling the truth.  Defendant also admitted he could not "be mad at [Harrell]" for testifying at the preliminary hearing.  While in custody on October 27, 2022, defendant made a phone call to his friend.  During the call, his friend implied defendant was a "Compton Crip," and defendant did not deny it.

## B.    Defense Evidence

Defendant's theory at trial was based on an alibi.  Defendant's parents (his mother and stepfather) testified that defendant had a seizure the day before the shooting and was unable to leave his home on the day of the shooting.

Defendant's parents said they drove to defendant's home on December 5, 2021, around 4:00 or 5:00 p.m. and spent the night.  "A little bit after 8 o'clock" the next morning, defendant's mother woke up to let a man from an alarm company into defendant's home.  Defendant's mother testified defendant was at home while the man worked "[a]ll day long."

Defendant's stepfather testified the alarm company employee arrived "around 7:45, 8 o'clock, 8:30."  He testified the work lasted about two or three hours.

Defendant's parents testified they were having breakfast with defendant, his wife, and son, when defendant exhibited troubling symptoms.  They said defendant appeared to be unconscious at times and was slouching and drooling, and defendant exhibited these symptoms for approximately eight hours.  Defendant's parents said they did not see defendant leave

7

home that day.  According to defendant's mother, defendant did not go to the hospital because he had issues with seizures and his wife knew how to treat them.

The alarm company employee also testified.  The employee testified he arrived at defendant's home at 8:50 a.m. on December 6, 2021.  The employee saw defendant and his family eating breakfast when he arrived.  Defendant appeared to be under the weather.  The employee did not see defendant leave the home.

## C.    Information, Verdict, and Sentencing

Defendant was charged with premeditated murder (§ 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2).  On count 1, the information further alleged defendant personally used a handgun in the commission of murder (§ 12022.5, subd. (a)).

Trial commenced in December 2022.  A jury convicted defendant as charged and found the enhancement allegation true.  On count 1, the jury found defendant guilty of first degree murder.

Defendant was sentenced to 25 years to life for murder, plus a consecutive four-year term for the firearm enhancement. Defendant was also sentenced to a consecutive two-year term for felon in possession of a firearm.  Defendant timely appealed.

## DISCUSSION

## A.    No Error in Failing to Instruct the Jury on Voluntary Manslaughter Based on Imperfect Self-Defense

Defendant contends the trial court erred by failing to instruct the jury on voluntary manslaughter based on the

doctrine of imperfect self-defense. He argues the failure to instruct on imperfect self-defense amounted to an incomplete instruction on the requisite element of malice. We disagree.

### 1. *Additional Background*

At the close of evidence, the trial court and parties discussed proposed jury instructions. Defense counsel objected to one instruction on the suppression of evidence (CALJIC No. 2.06), and agreed to all other instructions. The prosecution requested removing the term "manslaughter" from the title of CALJIC No. 8.74 ("Unanimous Agreement as to Offense—First or Second Degree Murder or Manslaughter") to avoid confusing the jury. Defendant did not object to this request or ask for a voluntary manslaughter instruction.

The court instructed the jury with CALJIC No. 8.10 on murder as follows:

> "Defendant is accused in Count 1 of having committed the crime of murder, a violation of section 187 of the Penal Code. [¶] Every person who unlawfully kills a human being with malice aforethought, is guilty of the crime of murder in violation of Penal Code section 187. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing was done with malice aforethought."

The jury was also instructed on first and second degree murder and the duty to determine the degree of murder (CALJIC Nos. 8.20, 8.30, 8.70-8.71, 8.74).

9

2. *Governing Law and Standard of Review*

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  First degree murder is perpetrated by "any [ ] kind of willful, deliberate, and premeditated killing."  (§ 189, subd. (a).)  The word "willful" means intentional, "deliberate" refers to the "'weighing of considerations for and against the proposed course of action,'" and "premeditated" relates to thinking before acting.  (*People v. Pearson* (2013) 56 Cal.4th 393, 440; see CALJIC No. 8.20.)

Manslaughter is the unlawful killing of a human being without malice aforethought.  (§ 192.)  California law recognizes several circumstances under which malice may be negated, and the offense limited to manslaughter, even if the defendant harbors an intent to kill.  (*People v. Rios* (2000) 23 Cal.4th 450, 460.)  One such circumstance occurs whenever a person kills in imperfect self-defense.  (*Ibid*.)

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter."  (*In re Christian S.* (1994) 7 Cal.4th 768, 771 (*Christian S.*); accord, *People v. McCoy* (2001) 25 Cal.4th 1111, 1116.)  Imperfect self-defense requires the defendant's fear to be of "'*imminent* danger to life or great bodily injury.  "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.'"'"  (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.)

10

A trial court must instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed. (*People v. Barton* (1995) 12 Cal.4th 186, 190.) But this sua sponte duty does not require instructing the jury on "the panoply of all possible lesser included offenses." (*People v. Huggins* (2006) 38 Cal.4th 175, 215.) Rather, ""such instructions are required whenever evidence that the defendant is guilty *only* of the lesser offense is 'substantial enough to merit consideration' by the jury."" (*Ibid.,* italics added.) In other words, a defendant charged with murder is entitled to an instruction on imperfect self-defense "if there is substantial evidence to support the theory." (*People v. Schuller* (2023) 15 Cal.5th 237, 253 (*Schuller*).)

Substantial evidence is evidence of solid probative value, viewed in context of the entire record, which ""a reasonable jury could find persuasive."" (*People v. Licas* (2007) 41 Cal.4th 362, 366 (*Licas*); see *People v. Conner* (1983) 34 Cal.3d 141, 149 [substantial evidence refers to evidence that "maintains its credibility and inspires confidence that the ultimate fact it addresses has been justly determined"].)

Given how California has chosen to structure the relationship between murder and voluntary manslaughter, a trial court's failure to instruct on imperfect self-defense amounts to an incomplete instruction on malice and is therefore subject to *Chapman* review for constitutional error. (See *People v. Wilkins* (2013) 56 Cal.4th 333, 348–350 [*Chapman* review applies to "incomplete" or "misleading" instructions on elements of crime].)

We review de novo the trial court's failure to instruct on a lesser included offense. (*Licas, supra*, 41 Cal.4th at p. 366.)

11

3.  *Insufficient Evidence Supported the Voluntary Manslaughter Instruction*

Defendant contends substantial evidence supports the finding he shot Bender in imperfect self-defense.[3]  We disagree.

The evidence adduced at trial unequivocally demonstrates defendant shot Bender with intent to kill, which was the result of deliberation and premeditation.  The day before the shooting, Bender "mad-dogged" defendant in front of defendant's fellow Kelly Park Crips gang members.  Defendant angrily pulled out his gun after the confrontation and left the residence.  The following morning, defendant drove by Harrell's residence, made a U-turn on the street, and parked his car in front of the driveway.  Defendant proceeded to get out of his car armed with a handgun, approached Bender, and shot him in the back as Bender ran away from defendant.  Defendant persisted even after Bender turned around to surrender with hands in the air, unarmed.  From three-to-four feet away, defendant pointed his gun at Bender and shot him three more times.

These circumstances amply demonstrate premeditation, deliberation, and an intent to kill.  (See *People v. Potts* (2019) 6 Cal.5th 1012, 1028 (*Potts*) [number and location of wounds inflicted on victim suggested killing was premeditated and deliberate]; *People v. Manriquez* (2005) 37 Cal.4th 547, 578 (*Manriquez*) [premeditation and deliberation present where

_____

[3]  Defendant did not raise this claim at trial.  Nevertheless, the trial court had a sua sponte duty to instruct the jury on any lesser offenses if substantial evidence supported doing so.  (See *People v. Brothers* (2015) 236 Cal.App.4th 24, 33, fn. 6 ["Silence cannot constitute a forfeiture of an argument [if] the trial court violate[s] its sua sponte obligation to instruct on a lesser included offense"].)

12

"defendant, armed with a concealed firearm, left his room at the motel, angrily confronted victim, and fired several times, inflicting multiple wounds to the victim's chest"].)

Even assuming defendant harbored no intent to kill Bender when firing the initial shot in the back, defendant willfully and deliberately, and with premeditation, fired three additional shots at Bender in close proximity after Bender's surrender. (See *Manriquez, supra*, 37 Cal.4th at p. 577 ["'[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly"'"].)

The evidence also established defendant's motive to kill Bender. Defendant, an Old-Time Gangster in the Kelly Park Crips, had been disrespected the day before when Bender "mad-dogged" him at Harrell's residence. Defendant had ample motive for retribution the following morning when he drove by Harrell's residence and saw Bender unarmed.

Defendant points to no direct evidence he actually believed he needed to act in self-defense in response to an imminent danger to life or great bodily injury. His alibi defense was premised on him not being the shooter or even at the scene of the crime. In calls from jail, defendant never claimed to have felt any fear on the day of the shooting. Instead, defendant admitted to his wife that Harrell's testimony about the shooting was truthful and that he could not "be mad at [Harrell]."

Nor do the circumstances reasonably lead to an inference defendant harbored such a belief when he shot Bender. Defendant was armed the moment he ambushed Bender, who

13

was unarmed throughout the shooting. That Bender and defendant had an armed confrontation the day before does not reasonably suggest Bender posed a danger to defendant at the time he opened fire on Bender. It was defendant—not Bender—who initiated the deadly confrontation. (See *Christian S., supra*, 7 Cal.4th at p. 773, fn. 1 ["the imperfect self-defense doctrine cannot be invoked" by a defendant "who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified"]; accord, *People v. Simon* (2016) 1 Cal.5th 98, 134 [defendant "initiated [the] aggressive interactions," the victim "was unarmed," and "there is no evidence [defendant] ever told anyone that he had acted out of fear"].)

Defendant now contends he "act[ed] in what he believed to be defense of his own safety" because Bender ran for his gun before defendant shot him. Defendant misconstrues the evidence. Bender began to run up the driveway once defendant got out of his car with a gun. Bender did not have a gun in his possession when defendant ambushed him, when he surrendered to defendant, or any time thereafter.

Because the imperfect self-defense theory was not supported by substantial evidence, the trial court did not have a sua sponte duty to instruct on voluntary manslaughter. As the trial court did not err, there is no need to analyze whether such an error was harmless.

Throughout his appellate opening brief, defendant relies heavily upon *Schuller, supra*, 15 Cal.5th 237, to argue that the imperfect self-defense theory applies to his case. *Schuller* is distinguishable. In *Schuller*, the defendant testified he shot the

14

victim, fearing for his life after the victim tried to stab and shoot him with his own gun. (*Id.* at pp. 246–247.) The defendant testified he fired additional shots because he was "'scared'" after the victim yelled, "'You f'd up'," and pushed himself off the ground without hesitation. The defendant said he suffered from delusions causing him to perceive the victim as a continuing threat. (*Ibid.*)

No similar scenario was presented in this case. Defendant marshalled no evidence demonstrating his fear of immediate harm or death or that Bender was armed before defendant repeatedly shot him. Defendant's reliance on *Schuller* is misplaced.

## B. Exclusion of Defendant's Statement to Law Enforcement

Defendant contends the trial court abused its discretion by excluding his statement to Sergeant Chow about suing him for "putting a case on him." Defendant avers the statement could have rebutted the prosecution's evidence that he was the shooter, particularly his admission during jailhouse calls that Harrell's testimony was truthful. We find no error or prejudice under the relevant standard.

### 1. *Additional Background*

Just before trial, Sergeant Chow went into lockup to photograph defendant's tattoos. The incident was recorded, and the video footage was seen by the prosecution and defense. According to the prosecution, defendant appeared "confrontational and aggressive" during the interaction, telling Sergeant Chow "he was going to sue him. He was going to come

15

after him and his wife." Defendant pumped out his chest during the interaction, which Sergeant Chow interpreted as a threat. The next day before jury selection, the prosecution notified the trial court of the incident. Defense trial counsel agreed defendant appeared angry during the confrontation, and perhaps defendant stated he would sue Sergeant Chow after trial for "putting a case" on him, but he did not interpret the statement as a threat. The trial court found the incident between defendant and Sergeant Chow not relevant to the trial.

During the prosecution's rebuttal case, the prosecution presented two recorded jailhouse calls in which defendant told his wife he could not be mad at Harrell's testimony because he "basically told the truth." Defendant did not present a surrebuttal. The next day, defense trial counsel requested permission to recall Sergeant Chow and question him about the lockup incident with defendant. Counsel argued the line of questioning about defendant's statement to Sergeant Chow was relevant because it shed light on "defendant's state of mind," and that "he never admitted being the shooter." The trial court denied the request, finding "absolutely no connection" between defendant's statement to Sergeant Chow and his state of mind when making the calls to his wife one year earlier and three years earlier during the crime.

2.    *Governing Law and Standard of Review*

No evidence is admissible except relevant evidence. (Evid. Code, § 350.) Relevant evidence is defined as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) ""The test of relevance is whether the evidence tends, 'logically,

16

naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.""" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1266, quoting *People v. Wilson* (2006) 38 Cal.4th 1237, 1245.) In other words, evidence is relevant if it pertains to an issue in the case and has some logical tendency to prove the matter at issue.

A trial court's discretionary ruling will not be overturned absent a clear showing of abuse of discretion resulting in a miscarriage of justice. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) When exercising its discretion, the court must adhere to applicable legal criteria and must not act arbitrarily. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 [a ruling constituting an abuse of discretion "has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it'"].)

### 3. *No Abuse of Discretion*

At trial, defendant argued his statement to Sergeant Chow was relevant because it revealed his state of mind at the time of the jailhouse calls and rebutted the prosecution's evidence offered to prove he was the shooter. The trial court rejected this argument and upheld its decision to exclude the evidence as irrelevant, finding "absolutely no connection" between defendant's statement to Sergeant Chow and defendant's state of mind when he made the calls to his wife a year earlier and three years earlier during the crime. We conclude the trial court properly exercised its discretion.

Defendant failed to make an adequate offer of proof regarding the relevance of his threat to sue the officer in relation to his state of mind during the jailhouse calls. (See *People v.*

17

*Brady* (2005) 129 Cal.App.4th 1314, 1333 ["'It is the burden of the proponent of evidence to establish its relevance through an offer of proof or otherwise'"].)  The threat did not address the phone calls or disprove the fact that defendant made the statements to his wife.  It also did not show the statements were taken out of context or lacked credibility.

At most, the threat of litigation was minimally relevant to defendant's state of mind.  There may have been different reasons for the threat, made shortly before trial.  For example, defendant may have been trying to intimidate Sergeant Chow before he testified against defendant, or he may have been displeased with Sergeant Chow's visit to take pictures of his tattoos.  As the trial court reasoned, any relevance between defendant's statement and what occurred years prior was tenuous and significantly outweighed by the amount of time required to explain the meaning and relevance of the statement. (See *People v. Anderson* (2018) 5 Cal.5th 372, 406 [upholding exclusion of testimony about codefendants spending time at a home with weapons, vehicles, and disguises months before the crime, as it was "tenuous at best" and outweighed by undue consumption of time].)

### 4. *Any Error Was Harmless*

Even assuming that it was error for the trial court to exclude defendant's statement to Sergeant Chow, the error is subject to review under the *Watson* standard.  Under this standard, we assess "whether there is a reasonable probability that the outcome of the trial would have been more favorable to [the] defendant' had the errors not occurred."  (*People v. Camacho*

18

(2022) 14 Cal.5th 77, 109; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Applying that standard here, we conclude any error was harmless because even if the statement had been admitted, it would have been a minor point compared to the overwhelming evidence of a willful, deliberate, and premeditated killing. Defendant argues it is reasonably probable he would have obtained a more favorable result, with at least one juror reaching a different conclusion regarding his guilt, had his statement been admitted. Admitting defendant's statement into evidence may have only hurt his case, casting defendant in a negative light by showing him threatening an officer.

Defendant also argues that excluding the statement infringed on his constitutional right to present a complete defense. The trial court did not preclude defendant from proving he was not the shooter. To the contrary, defendant presented evidence at trial that he was not present at the shooting and could not have been the shooter. Excluding evidence on a subsidiary point did not impair his right to present a complete defense. (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1064 ["'excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense'"].) Defendant had ample opportunity to rebut the prosecution's evidence, but the jury found his alibi unconvincing.

Given the significant evidence against him, it is not reasonably probable the statement would have changed the jury's verdict if it was admitted. Thus, any error by the trial court was harmless.

## DISPOSITION

The judgment is affirmed.


MORI, J

We concur:


CURREY, P. J.


COLLINS, J.